Filed 8/20/14  P. v. Cromer CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHARLES EDWARD CROMER, SR.,<br><br>    Defendant and Appellant. | B247779<br><br>(Los Angeles County<br>Super. Ct. No. NA087417) |

        APPEAL from a judgment of the Superior Court of Los Angeles County.  Gary J. Ferrari, Judge.  Affirmed.

        Suzann E. Papagoda, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Pamela C. Hamanaka, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Charles Cromer appeals from the judgment entered following a jury trial in which he was convicted of inflicting injury on a child in violation of Penal Code section 273d, subdivision (a),[1] with a finding he personally used a deadly or dangerous weapon.

Defendant contends the trial court erred by excluding the testimony of a paramedic regarding whether the child's bruises appeared fresh, and that the exclusion violated defendant's right to present a defense. We disagree. The proposed evidence was irrelevant because the paramedic could testify with certainty only that the bruises appeared to have been inflicted an hour or more before he saw the child, which was more than four hours after the child left defendant's home and went to school.

Defendant further contends the trial court violated his constitutional right to be present at his trial by conducting the bifurcated trial of prior conviction allegations when he was absent to obtain medical care. We agree, but find the error harmless beyond a reasonable doubt, given the strong evidence of defendant's prior convictions.

## BACKGROUND

### 1. The relationship between defendant and victim L.S.

Gretta Thompson is a licensed vocational nurse. She also may have been defendant's "live-in" girlfriend, although this was disputed at trial. In April of 2010 she worked as an in-home nurse for defendant, assisting him with dialysis and diabetes-related issues.[2] She and her children (including L.S.) and their cousin spent nights at defendant's Torrance apartment when doing so made it easier to get to her other job early in the morning.

### 2. The injury to L.S.

On the night of April 29, Thompson, her teenage daughter B., her children L.S. (then age five), K.S. (then age 10), and their cousin A.T. (then age six) stayed at

---

[1] Undesignated statutory references are to the Penal Code.

[2] Undesignated date references are to 2010.

defendant's apartment. Thompson testified that when the children arrived from their grandmother's house, L.S. had no injuries of which Thompson was aware. Thompson left for work somewhere between 4:45 a.m. and 5:15 a.m. on April 30.

On April 30, L.S. approached a teacher's aide and asked to visit the school nurse because his arm hurt. The aide saw bruises and red welts running the length of L.S.'s arm. She testified the injuries were more prominent than depicted in the prosecution's photographic exhibit. The aide asked L.S. what happened to him, and he said his dad had "belted him" because he could not find his folder. The aide notified the school principal and L.S.'s teacher.

The school principal testified she looked at L.S.'s injuries, which the prosecution's photographic exhibits accurately depicted. L.S. told the principal his dad had spanked him with a belt because he could not find his folder. As far as the principal knew, defendant was L.S.'s father. Often when school personnel called to get help with disruptive behavior by L.S., defendant came to the school. On those occasions, L.S. would begin behaving correctly as soon as he saw defendant.

Three of the four Los Angeles Police Department officers who responded to L.S.'s school on April 30 testified at trial. Each officer said he observed the injuries to L.S., as depicted in the prosecution's photographic exhibit, which consisted of photographs taken by the police. The police summoned paramedics, who removed L.S.'s shirt, revealing additional injuries.

Officer Gerardo Velasco spoke to L.S., who said his daddy had hit him with a belt about 10 times because he did not get his folder quickly. A different officer spoke to 10-year-old K.S., who said his "new daddy" Charles had hit L.S. for forgetting or losing his folder. Charles previously had hit K.S. with a belt and a shoe. Officer Vincent Pacheco spoke to six-year-old A.T., who said "Uncle Charlie" had hit L.S. with a belt on his arms and legs because L.S. had not done his homework and could not find his folder or crayons. A.T. said he had also been hit by "Uncle Charlie."

Pacheco testified his partner interviewed a woman he believed was the mother of L.S. at the school in Pacheco's presence. Pacheco testified the woman said defendant was her "live-in boyfriend," but she was trying to end the relationship. The officers took the three boys to the police station.

Thompson testified L.S. would just cry when she asked him who had hurt him, but eventually he told her his teacher had hit him "too."

### 3. Subsequent interviews of the children[3]

Detective Trish Criswell interviewed each of the boys separately on October 8. Recordings of these interviews were played for the jury at trial.

Criswell showed L.S., who was then six years old, the photographs taken by police and asked him how he had gotten the depicted marks on him. L.S. explained his daddy, "Charles Cromer," "whooped" him with "the metal side" of a "big old belt" and it hurt. He said defendant hit him on his arms, legs, back, chest, and "[e]verywhere." L.S. said defendant had hit him because he did not listen to his teacher. He was afraid of defendant and wished he did not have a dad. Criswell saw marks on L.S. and asked him about them. L.S. said they were from the prior school year when his dad spanked him and it left sores. L.S. said defendant also had hit K.S. and A.T. with a belt.

Criswell attempted to interview K.S., but he "shut down" and would not answer her questions about defendant or the incident with L.S.

A.T. told Criswell the marks on L.S. depicted in the police photographs resulted from "dad," whose name was Charles, "whoop[ing]" L.S. with a belt because L.S. did not want to make his bed. A.T. said L.S. was screaming and crying, and some neighbors knocked on the door and said, "'Knock it off.'" Defendant stopped, and the boys walked to school, where L.S. "started telling people." A.T. said he had been hit by defendant on two prior occasions, but "now, [defendant's] trying to be nice," and was using his hands to spank L.S.

**4. The children's testimony**

L.S., who was eight years old by the time of trial, cried and denied everything, including knowing defendant, being the person depicted in the prosecution's photographic exhibits, having been hurt, telling people he had been hit, and living with his mother, K.S., and A.T.

K.S., who was then 12 years old, testified he had lived with defendant "a long time ago," but did not remember L.S. being hurt. K.S. insisted he had never seen defendant hit anyone, and defendant had never hit K.S. K.S. denied he feared defendant.

A.T., who was also eight years old at the time of trial, testified he lived with his cousins, L.S. and K.S. A.T. did not remember the incident when L.S. got hurt, but he remembered talking to the police about it and he told them the truth, but he was "just going by what" L.S. said and did not "even know if he got hit." A.T. insisted he did not fear defendant, defendant had never hit A.T., and after L.S. got injured, they never saw defendant again.

**5. Defendant's testimony**

Defendant testified he loved L.S., K.S., and A.T. and considered them to be his children. He denied ever hitting any of them.

Defendant testified he suffered from diabetes, high blood pressure, kidney failure, and gout. Thompson was his sole healthcare worker and helped him with his dialysis and medications. She stayed at his Torrance apartment four or five nights per week, and the boys were usually there two or three nights per week. Thompson's teenage daughter B. "always stayed there."

Defendant was already asleep when the boys arrived at his apartment on the night of April 29, and they had already left for school when he awoke on April 30. The boys had been staying with their grandmother (Thompson's mother) for about a week prior to April 29. Defendant testified Thompson's mother, brother, and sister "whooped" the

---

[3] The children's interviews were admitted at trial as prior inconsistent statements

boys, and defendant had gotten into a fight with Thompson's brother about that. K.S. once came back from his grandmother's house with a black eye, and A.T. once came back with a broken arm. In addition, defendant had often stopped Thompson from beating all three boys with her hands or a belt.

Defendant admitted he had several prior felony convictions. He did not, however, admit the 1989 convictions for shooting at a motor vehicle and assault with a firearm alleged as the basis for sentencing under the "Three Strikes" law and section 667, subdivision (a)(1).

## 6.      Verdicts and sentencing

The jury convicted defendant of inflicting injury on a child in violation of section 273d, subdivision (a), with a finding he personally used a deadly or dangerous weapon, a belt. Defendant, who was out on bail, did not appear the day the jury reached its verdict or the next day, so the court held the bifurcated jury trial on "strike" and prior serious felony conviction allegations in defendant's absence. The jury found the allegations true.

On defendant's motion, the trial court dismissed one of defendant's strikes and sentenced him to a second strike term of 18 years in prison.

**DISCUSSION**

## 1.      Exclusion of evidence

Defendant sought to call Hans Enyeti, one of the paramedics who responded to L.S.'s school on April 30. At the prosecutor's request, the court conducted an Evidence Code section 402 hearing with Enyeti, who testified he had been a paramedic for 30 years and, based upon his training and experience, the injuries to L.S. appeared to be "old" because the bruises were "beige" and L.S. did not appear to be distressed.

On cross-examination, Enyeti testified that by "old" he meant "an hour, two hours, it could be older than that, it could be a day." Enyeti and his partner arrived at the school at 1:31 p.m. Enyeti conceded he had not been "trained to timeline on injuries," but "how

pursuant to Evidence Code section 1235.

to act, what needs to be done and what we're going to do . . . ." When the prosecutor showed him the color photographs of L.S.'s injuries, Enyeti explained he had only reviewed black and white photographs provided by the defense to refresh his memory. He agreed the color photographs depicted redness, indicating "fresher" injuries.

The trial court granted the prosecution's motion to exclude Enyeti's testimony on the ground it had no probative value, even if Enyeti were deemed to have sufficient expertise, because the "most [Enyeti] could quantify is old is more than an hour," L.S. would have been in school since 8:00 or 9:00 a.m.[4] on April 30, and everyone agreed the injuries did not happen in school.

Defendant contends that the trial court erred by excluding Enyeti's testimony, and that the exclusion violated defendant's right to present a defense.

### a. Relevant legal principles

Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence is relevant if it has any tendency in reason to prove or disprove any disputed fact of consequence to the determination of an action. (Evid. Code, § 210.)

We review any ruling on the admissibility of evidence for abuse of discretion. (*People v. Elliott* (2012) 53 Cal.4th 535, 577.)

Proper application of the rules of evidence generally ""does not impermissibly infringe upon a defendant's right to present a defense.""" (*People v. Thornton* (2007) 41 Cal.4th 391, 443.) The right to present a defense does not permit a defendant to introduce irrelevant or marginally relevant evidence. (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.)

### b. The trial court properly excluded Enyeti's proposed testimony

Enyeti's proposed testimony was irrelevant because it had no tendency in reason to prove or disprove that defendant inflicted the injuries. Enyeti's opinion that the bruises were "old" was based upon viewing black and white photographs, and upon

review of color photographs he opined the injuries were red and "fresher." In addition, because he used "old" to mean inflicted one or more hours before he viewed L.S., and L.S. had been in school for more than four hours, or perhaps more than five hours, before Enyeti saw him and the police photographed him, even Enyeti's original opinion that the bruises were "old" neither exonerated nor incriminated defendant. Nor did his opinion have any relevance to any other disputed fact of consequence in the case. Accordingly, the trial court properly excluded Enyeti's proposed testimony.

For the same reasons, defendant could not have been prejudiced by the exclusion of Enyeti's testimony.

## 2.    Defendant's absence from trial on prior conviction allegations

At the end of the day counsel argued the case and the court gave the jury most of the instructions. Out of the presence of the jury, the court said, "[I]f Mr. Cromer has anything he may need should he be convicted, he needs to bring those medications with him tomorrow."

When trial resumed the next morning, defendant, who had been released on bail, was not present. The court discussed the matter with counsel outside the presence of the jury. Defense counsel told the court defendant had left him a phone message saying he had gone to the emergency room at a specified hospital at 3:00 a.m. because "his dialysis system was compromised." Counsel further stated he had phoned the emergency room at 7:30 a.m. and confirmed that defendant was there, waiting to be seen. With the consent of both the prosecutor and defense counsel, the court finished instructing the jury in defendant's absence after telling the jury not to consider the defendant's absence for any reason.

After the jury began deliberating, the court told counsel the hospital had informed the bailiff defendant had been admitted at 5:36 a.m.

---

[4] The court suggested children start school at 9:00 a.m., while the defense asserted they start at 8:00 a.m.

After the lunch recess, defense counsel informed the court he had been told defendant would be discharged from the hospital about 1:30 p.m. and would go to another facility for about nine hours of dialysis. Counsel also said defendant had represented he would be in court at 9:00 a.m. the next day. Counsel and the court then discussed the trial of the prior conviction allegations, and defense counsel advised the court, "I expect there to be a waiver."

Later the same day, the jury indicated it had reached a verdict. The court directed the jury to seal the verdict and return the next morning.

Defendant was still absent when trial resumed the next morning. Defense counsel told the court a nurse at the dialysis center had phoned him and said defendant "had an issue during dialysis last night, so they had to call 911. The paramedics came to get him, took him back to" the hospital, which admitted him.

The court stated it found it "interesting" there had been "no issue with dialysis, no issue with anything until a couple of days ago when I mentioned to" defense counsel that defendant "needed to bring his medication because should he be convicted he would be remanded. And now all of a sudden we have all of these issues and just find it very, very strange that it would start once he got the thought in his mind perhaps if he was convicted he was going into custody."

Defense counsel said the nurse told him defendant "went into some sort of shock, spiraling into a shock and started cramping up so the dialysis wasn't going through his system. [¶] I don't think that's something that can be faked like chest pains and before any of us start pretending to be oracles and certainly—or doctors, certainly I imagine the higher level of stress may have affected him, I don't know. But before we start assuming the worst in people, I think he deserves the benefit of the doubt."

Defense counsel and the prosecutor agreed the court should take the verdict in defendant's absence. The court concluded defendant was voluntarily absent and took the verdict. It then issued a bench warrant for defendant, but told Detective Criswell, who

9

was about to leave for the hospital, not to remove defendant from the hospital "unless the medical personnel authorize that."

At the prosecutor's urging and without objection by defense counsel, the trial court proceeded with the trial of prior conviction allegations with the same jury, in defendant's absence. The prosecutor presented two section 969b packets from the Department of Corrections and Rehabilitation and the testimony of her paralegal to establish two of defendant's prior convictions: assault with a firearm in violation of section 245, subdivision (a)(2) and shooting at an occupied motor vehicle in violation of section 246, both of which occurred in 1989 in a single case in Los Angeles County Superior Court. Defendant was sentenced on those counts in 1991. The defense did not cross-examine the paralegal and presented no evidence or argument. The jury found defendant had been convicted of both prior offenses.

Defendant contends the trial court erred by concluding he was voluntarily absent and trying the prior conviction allegations in his absence. We agree, but find the error harmless.

### a.    The right to be present

We review the trial court's decision to proceed with the trial in defendant's absence de novo, "'insofar as the trial court's decision entails a measurement of the facts against the law.'" (*People v. Gutierrez* (2003) 29 Cal.4th 1196, 1202 (*Gutierrez*); *People v. Waidla* (2000) 22 Cal.4th 690, 741.)

A criminal defendant is entitled to be personally present at trial. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) This right is rooted in both the confrontation clause and due process. (*United States v. Gagnon* (1985) 470 U.S. 522, 526 [105 S.Ct. 1482].) Penal Code section 1043 also protects a defendant's right to be personally present at his trial. Section 1043, subdivision (b) permits a trial to continue during the voluntary absence of the defendant in noncapital cases.

"A defendant's right to presence is 'fundamental to our system of justice and guaranteed by our Constitution.' [Citation.] Thus, a trial court should not 'summarily

10

plung[e] ahead' with trial in a defendant's absence." (*Gutierrez*, *supra*, 29 Cal.4th at p. 1209.) Instead, "a trial court should take reasonable steps to ensure that being absent from trial is the defendant's choice." (*Id.* at p. 1206 [defendant who refused to leave lockup was "voluntarily absent"].) "In determining whether a defendant is absent voluntarily, a court must look at the 'totality of the facts.'" (*Id.* at p. 1205; *People v. Connolly* (1973) 36 Cal.App.3d 379, 385.) A defendant's "'consent [to waive his right to be present at trial] need not be explicit. It may be implicit and turn, at least in part, on the actions of the defendant.'" (*Gutierrez*, *supra*, at p. 1206.)

Error concerning a defendant's right to be present is "subject to harmless-error analysis [citations] unless the deprivation, by its very nature, cannot be harmless." (*Rushen v. Spain* (1983) 464 U.S. 114, 118, fn. 2 [104 S.Ct. 453].) If the error violates a defendant's federal constitutional rights, it is evaluated under the harmless beyond a reasonable doubt standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824].

**b.      Error in proceeding with the trial in defendant's absence was harmless beyond a reasonable doubt**

The trial court erred by concluding defendant's absence was voluntary. It was undisputed defendant had serious, preexisting, chronic medical issues and that he was at a hospital emergency room for the purpose of receiving medical care related to those issues on both of the days he failed to appear at trial. Although the court thought the timing of defendant's emergency room visits highly suspicious, the timing may have indicated a stress-induced emergency, as opposed to malingering or a self-induced condition that could be deemed a voluntary absence (*People v. Rogers* (1957) 150 Cal.App.2d 403, 413 [where record reflected self-inflicted insulin shock and refusal to take ameliorative steps, defendant deemed to have waived right to be present].) No evidence suggested defendant's emergency room visits were based upon either a feigned or self-induced condition.

11

Nonetheless, we conclude the error in proceeding with the trial of the prior conviction allegations was harmless beyond a reasonable doubt. The prosecutor proved the existence of the two prior convictions alleged in the strike and section 667, subdivision (a)(1) enhancement allegations by means of an abstract of judgment in the section 969b packet. Each packet included a photograph, which the jury could have compared to defendant's appearance at trial to establish identity. Had defendant been present at the trial of the prior conviction allegations, the best—and probably only— defense he could have raised was to testify and deny the convictions. The jury's verdict on the child injury charge demonstrated it had not found defendant to be a credible witness, and there is no reasonable probability the same jury would have rejected the documentary and photographic evidence of defendant's convictions had defendant denied them. Notably, defendant's trial testimony corroborated much of the section 969b packets, in that the packets reflected all of the felony convictions defendant admitted he had suffered. Accordingly, holding the priors trial in defendant's absence was harmless beyond a reasonable doubt.

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


MILLER, J.*

We concur:


CHANEY, Acting P. J.


JOHNSON, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.