*223
 
 Opinion
 

 LILLIE, Acting P. J.
 

 A jury found defendant guilty of escape without force, and to be true four prior felony convictions (burglary, receiving stolen property, grand theft, escape); and that he was sane at the time of the commission of the offense. He appeals from the judgment. The sole issue is whether the trial court erred in failing to hold a hearing as to defendant’s mental competence, pursuant to section 1368, Penal Code.
 

 The evidence offered on the guilt phase established defendant as an accomplished escape artist. Defendant was transferred from his cell at county jail to county hospital. Officer Kruchi remained'-outside and guarded the door of defendant’s room; in the evening of January 30, 1977, he saw defendant in bed wearing a neck brace and bound with leg irons attached around the bed; to open the leg irons it was necessary to turn the lock on both ankles; he last checked on defendant at 3:30 a.m. on January 31; around 4 a.m. he entered the room and defendant was gone; the cuffs were still on the bed with the neck brace; a screen had been removed and the window was open; the only way defendant could have gotten out of the room was through the window because the door of the room was guarded at all times; a piece of broken safety pin was on the floor; a search of the grounds was unsuccessful and the next time he saw defendant was in the jail in April. During trial and before going into the courtroom, defendant was searched; Officer Crespo found on him embedded in a box of matches a safety pin the end of which was bent to simulate the small part of a handcuff key.
 

 Defendant testified that two individuals carried him out of county hospital explaining they were going to help him because they did not like the way he was treated; he did not voluntarily leave. The safety pin was in the pocket of a jail jumper issued to him; he was going to turn it in.
 

 On the sanity trial, Mr. Langman, a psychiatric social worker for County Department of Mental Health and in charge of the county jail program for psychiatric services, testified for defendant. He knew and had numerous discussions with defendant while in jail, and on June 27 in an isolation cell administered tests consisting of the Minnesota Multiphasic Inventory (MMPI); he sought the aid of a doctor to analyze the results, and it was determined that defendant was “on the scales that have to do with schizophrenia and psychotic illness, an extremely high score ____”; on the “lie scale,” defendant “showed up as having given a very valid test”; test results indicated a high degree of paranoia; psychosis as a
 
 *224
 
 personality trait was present; he felt defendant’s “reality testing is greatly suspect and matches a schizophrenic scale”; he would describe defendant’s “reality concept as being way off from the normal”; “since the sociopathic scale is very low I would consider [defendant] to be a good candidate for treatment.”
 

 For the People, Doctors Wells and Patterson, practicing psychiatrists and appointed by the court, testified that they gave defendant a psychiatric examination in the jail on June 15 and 10 respectively; each doctor formed the opinion that at the time of the escape on January 31 defendant was capable of knowing or understanding the nature and quality of that act, and of knowing or understanding that the act of escape was wrong. Dr. Wells found no indication that defendant suffered from any mental disturbances and Dr. Patterson found nothing that would substantiate the presence of a significant disorder at the time of the commission of the offense which would render him incapable of understanding the difference between right and wrong.
 

 On April 14 Officer Casey went to Colorado Springs, El Paso County, Colorado and brought defendant to Santa Barbara in a private aircraft; while in an Arizona airport where the plane was refueling, defendant wearing leg irons, a handcuff device affixed to his legs and “belly chain” around his waist to restrict movement, went to the restroom; outside, Officer Casey observed the screen to the restroom window open and a hand protrude; he moved up and observed defendant was not wearing handcuffs; defendant bolted through the door of the restroom past a guard and exited the building; after a lengthy search he was found in an airport office hiding beneath the desk; the handcuffs were on one hand only and both leg shackles were clipped to one leg. Officer Casey had taken custody of defendant’s property among which was a California license (exh. 3) on which the person depicted is defendant; it was issued February 14 in the name of Jeff Lee Hollow who took the written and driving test with a passing score of 87.
 

 Appellant points to Mr. Langman’s testimony, his “bizarre” courtroom behavior—his escape from leg irons during trial,
 
 [1]
 
 “joking” with counsel and the baliff, and rambling testimony—his rebuttal testimony concerning a prior period of mental disorder, chaotic family life, drug abuse, the circumstances of his escape from the hospital and attempted escape at the airport, and long history of criminal activity, his “self-destructive and
 
 *225
 
 violent behavior”
 
 [2]
 
 and the “presence of insane delusions” as constituting “substantial” evidence to raise a doubt in the mind of the judge of his mental competence to stand trial or at least to be sentenced, under section 1368, Penal Code. The statute provides that if, during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of defendant, he shall state that doubt in the record and inquire of defense counsel whether in his opinion defendant is mentally competent; and at the request of defendant or his counsel or upon its own motion the court shall recess the proceedings for as long as reasonably necessary to permit counsel to confer with defendant and to form an opinion as to his mental competence at that point in time. A hearing is provided during which all criminal proceedings shall be suspended until the question of the present mental competence of defendant has been determined. (§ 1368, Pen. Code.)
 

 Absent from the record before us is any evidence that reasonably would create a doubt, or even a hint that a doubt was created in the mind of the judge as to the mental competence of defendant to stand trial or be sentenced. The asserted lack of mental competence now urged by appellant was at no time suggested to the trial court by defendant, his counsel, the experts or anyone else; and appellant has clearly failed to demonstrate any substantial evidence which would have required a hearing under section 1368.
 

 “Section 1368 implements a fundamental canon that a ‘person cannot be tried, adjudged to punishment, or punished for a public offense, while he is insane’ (§ 1367). A defendant is sane within the meaning of section 1368 ‘if he is able to understand the nature and purpose of the proceedings taken against him and to assist counsel in the conduct of a defense in a rational manner, . . .’ [Citations].”
 
 (People
 
 v.
 
 Laudermilk, 67
 
 Cal.2d 272, 282 [61 Cal.Rptr. 644, 431 P.2d 228];
 
 People
 
 v.
 
 Pennington, 66
 
 Cal.2d 508, 515 [58 Cal.Rptr. 374, 426 P.2d 942];
 
 People
 
 v.
 
 Jensen,
 
 43 Cal.2d 572, 576 [275 P.2d 25];
 
 People
 
 v.
 
 Brock, 57
 
 Cal.2d 644, 648-649 [21 Cal.Rptr. 560, 371 P.2d 296].) The United States Supreme Court in
 
 Pate
 
 v.
 
 Robinson
 
 (1966) 383 U.S. 375, 378 [15 L.Ed.2d 815, 818, 86 S.Ct. 836] held that a defendant has a constitutional right to a hearing on present sanity if he comes forward with substantial evidence that he is incapable, because of mental illness, of understanding the nature of the proceedings against him or of assisting in his defense. Once such
 
 *226
 
 substantial evidence appears, a doubt as to defendant’s sanity exists, and when he has come forward with substantial evidence of present mental incompetence, he is entitled to a hearing under section 1368 as a matter of right, the judge then having no discretion to exercise.
 
 (People
 
 v.
 
 Pennington,
 
 66 Cal.2d 508, 518 [58 Cal.Rptr. 374, 426 P.2d 942].) In
 
 People
 
 v.
 
 Laudermilk,
 
 67 Cal.2d 272 [61 Cal.Rptr. 644, 431 P.2d], defense counsel moved for a sanity hearing under section 1368; the motion was denied. Said the court at page 285: “. . . even under the substantial evidence test of
 
 Pate
 
 and
 
 Pennington
 
 more is required to raise a doubt than mere bizarre actions
 
 (People
 
 v.
 
 Kroeger
 
 (1964) 61 Cal.2d 236, 243-244 [37 Cal.Rptr. 593, 390 P.2d 369]) or bizarre statements
 
 (People
 
 v.
 
 Williams
 
 (1965) 235 Cal.App.2d 389, 398 [45 Cal.Rptr. 427]) or statements of defense counsel that defendant is incapable of cooperating in his defense
 
 (People
 
 v.
 
 Daily
 
 (1959) 175 Cal.App.2d 101, 108-109 [345 P.2d 558]) or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant’s ability to assist in his own defense
 
 (People
 
 v.
 
 Jensen, supra,
 
 43 Cal.2d 572, 579).”
 

 We are satisfied after examination of all pertinent evidence before the trial court that defendant has not come forward with substantial evidence of present mental incompetence—he is incapable of understanding the nature of the proceedings against him or of assisting in his defense—that would entitle him to a hearing under section 1368. It was the opinion of Doctors Wells and Patterson that defendant was sane at the time of the commission of the offense; and while neither doctor was asked for or expressed his opinion as to defendant’s present sanity, their reports and testimony in no manner indicate that defendant was or that either doctor felt that defendant was unable to understand the nature and purpose of the criminal proceedings against him or to assist in his defense. Indeed, defendant’s conduct during trial and self-serving statements to Dr. Wells and in his own testimony can best be understood when considered in light of Dr. Patterson’s opinion that “there is a superficial impression the [defendant] presents of showing marked mental disorder. However, as the interview progressed I was more impressed that the [defendant] is highly manipulative type of individual, who is not disordered mentally to any degree .that he attempts to present. There are many areas of his performance in a clinical interview which indicate that he has good reality contact, is aware of what is occurring and can function in a mental sense in an adequately effective fashion. He does show . indications to be highly defensive of himself, rationalizes his behavior, and projects responsibility. I have the distinct impression that the
 
 *227
 
 [defendant] is simulating a much greater emotional disturbance than he actually does present.” This simply means that defendant tried to feign insanity or emotional disturbance but failed. Nothing in Mr. Langman’s testimony casts any doubt as to defendant’s present sanity or ability to understand the nature of the proceedings against him and assist in his own defense. Actually, Langman gave defendant a test the results of which he had to have a doctor analyze for him, which test he admits can only be used as a guide; he said defendant is not disoriented or disorganized but “felt his reality testing is greatly suspect and matches a schizophrenic scale.” More is required to raise a doubt than the results of the one test with no reference to defendant’s ability to assist in his own defense.
 
 (People
 
 v.
 
 Laudermilk,
 
 67 Cal.2d 272, 285 [61 Cal.Rptr. 644, 431 P.2d 228].)
 

 Escape from his leg irons during trial “for no apparent reason”
 
 [3]
 
 at most suggests defendant’s great expertise in picking locks and removing leg and handcuffs, self-assertive and arrogant bravado in doing this in the presence of the deputies and a certain pride in showing authorities “you can’t hold me.” The only evidence in the record of “joking” is not, as here asserted by appellant, that “he continually joked throughout the trial with counsel and the bailiffs,” but that at the last recess he and his counsel talked in the jury room and counsel “was telling me a joke,” and, asked if while the juiy was out he was “cracking jokes” with the bailiffs, he answered “That’s the only thing you can do.” This evidence, hardly suggests defendant was incapable because of mental illness of understanding the nature and purpose of the proceedings against him or of assisting counsel in the conduct of his defense in a rational manner; nor does the fact of defendant’s “rambling” to Dr. Wells and in his own testimony, although it well may indicate defendant is inarticulate or even likes to hear himself talk. His testimony concerning prior mental problems, chaotic family life, drug abuse, criminal activity and his version of his escape and attempted escape is completely self-serving, and has no reference to his ability to assist in his own defense. We assume that the foregoing was told by defendant as background material to Mr. Langman and Doctors Wells and Patterson when they examined him and that they considered it together with all other information received by them in forming their expert opinions. Appellant’s attempt here to portray himself as disordered mentally by pointing to his conduct, statements and testimony is no more successful than it was in the court below.
 

 
 *228
 
 We conclude that whether the foregoing be considered severally or in combination, it was not such as to, nor did it raise a doubt in the mind of the judge as to defendant’s present sanity within the meaning of section 1368; and it falls far short of the substantial evidence of defendant’s present mental incompetence—inability to understand the nature and purpose of the proceedings against him and to assist counsel in the conduct of his defense in a rational manner—necessary to require the trial court at any time to stop the proceedings and conduct a hearing under the statute.
 
 People
 
 v.
 
 Melissakis,
 
 56 Cal.App.3d 52 [128 Cal.Rptr. 122], relied on by appellant is inapposite; it is distinguishable on its facts.
 

 The judgment is affirmed.
 

 Thompson, J., and Hanson, J., concurred.
 

 [1]
 

 The court had ordered that during trial he be restrained with handcuffs and two sets of leg irons; it appears that while seated in the courtroom defendant freed himself.
 

 [2]
 

 At the airport in his escape he ran past an armed guard; and defendant told Officer Casey he should have shot him and would have blown his head off if he had a gun, and prior to getting on the plane, “I am not going to State prison. I will try and crash the plane and kill everyone.”
 

 [3]
 

 Asked on cross-examination if he removed one of the leg shackles while seated in the courtroom during trial, defendant answered “Yeah—Yeah, I did. Yes, I did.”